UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

CHRISTOPHER FOX,
     Plaintiff,


     - vs -                              Case No.: 2:15-cv-0439
                                           (DRH)(ARL)

COSTCO WHOLESALE CORP.,
     Defendant.
_____

*Appearances*:

JONATHAN A. TAND & ASSOCIATES, P.C.          For the Plaintiff
990 Stewart Ave., Ste. 130
Garden City, New York
By:     Jonathan A. Tand, Esq.

SEYFARTH SHAW LLP                 For the Defendant
620 Eighth Ave., 32nd Fl.
New York, New York
By:     Lorie E. Almon, Esq.
           Paul Galligan, Esq.


**HURLEY, Senior District Judge**:

### MEMORANDUM & ORDER
### REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Defendant Costco Wholesale Corp. ("Costco") moves the Court for summary judgment in

its favor on all of the employment-discrimination-based claims of Plaintiff Christopher Fox

("Fox"). (*See* ECF No. 25; hereafter, the "Summary Judgment Motion".) Fox opposes the

Summary Judgment Motion *in toto*. (*See* ECF No. 24[1]; hereafter, the "Opposition".) For the reasons that follow, the Summary Judgment Motion is granted.

## II. BACKGROUND[2]

*A. Factual Background*

1. <u>Generally</u>

When this action commenced, Fox was 38-years-old. Since birth, Fox has suffered from Tourette's Syndrome ("Tourettes") and Obsessive Compulsive Disorder ("OCD"). His Tourettes manifests itself with verbal and physical tics, and Fox's OCD compels him to engage in certain rituals, including counting rituals.

Since March 1996, Fox has worked for Costco – a members-only warehouse purchasing center – always at its Holbrook, New York warehouse (hereafter, the "Holbrook Warehouse" or "Warehouse"). He has held various positions at the Holbrook Warehouse, including:

---

[1] For clarity, the Court notes that Fox's Opposition was docketed twice: independently as ECF No. 24, and in accordance with the Court's bundling procedure, as ECF No. 25-5. However, the two documents are identical.

[2] Unless otherwise noted, this "Background" section is drawn from the parties' Local Rule 56.1 Statements (*see* ECF No. 25-4; hereafter, "Costco's LR 56.1 Statement"; *see also* ECF No. 25-8; hereafter, "Fox's LR 56.1 Statement"), the exhibits attached to the Galligan Declaration, submitted in support of Costco's Summary Judgment Motion (*see* ECF No. 25-1 (identifying the exhibits); *see also* Tand Declaration (referring the Court to Costco's Exhibits "for purposes of deciding this motion, and for the purpose of preparing" Fox's LR 56.1 Statement)), and the additional exhibits attached to the Tand Declaration, submitted in support of Fox's opposition to the Summary Judgment Motion (*see* ECF No. 25-7).

Herein, citations to deposition testimony will identify the deponent's name, followed by the page and line numbers assigned in the subject deposition transcript. For clarity, the Court further notes that the excerpted deposition transcripts are exhibits to the Galligan Declaration and are docketed under ECF No. 25-2.

(1) on the Front End as an Assistant Cashier, boxing orders and assisting Cashiers; and

(2) in Member Services as a Greeter, including:

> (a) welcoming members as they entered and checking for their membership cards,
>
> (b) checking members' receipts as they exited, as well as,
>
> (c) performing floor walks, during which the Member Services employee walks throughout the Warehouse, with a cart that has a mop and broom (a "front-end-cart"), checking on the Warehouse's cleanliness and other matters.

Costco has anti-discrimination, anti-harassment, and anti-retaliation policies in place and strives to make its employees aware of those policies by, among other things, presenting them to employees during their orientations. Costco also has an "Open Door Policy" under which employees are encouraged to report any incidents they believe to be discriminatory, harassing, and/or retaliatory. It is found in the Costco Employee Agreement.

Employees at the Holbrook Warehouse, including Fox, are members of the Teamsters' Union ("Union") and work under a collective bargaining agreement ("CBA"). The CBA includes reporting procedures pursuant to which employees can raise issues alleging discrimination, harassment, and/or retaliation. It also incorporates Costco's Rules and Regulations ("R&Rs"), which, among other things, define conduct that Costco considers to be minor or major offenses and for which, depending on the nature and seriousness of an offense, may subject an employee to disciplinary action or discharge.[3] Other than a vague recollection of being presented with papers and being told what certain papers addressed and what sections of

---

[3] *See also* Resnikoff Depo. 76:8-24 (testifying that all major violations are cause for termination).

papers to read and not read, and then being instructed to sign off on receipt of those papers, Fox has no specific recollection of reading, receiving, or being aware of Costoc's anti-discrimination, anti-harassment, and anti-retaliation policies, its "Open Door Policy," or its Employee Agreement. (*See* Fox Depo at 39:20-42:22.)

In June 2013, the General Manager at the Holbrook Warehouse was Larry Resnikoff ("Resnikoff"); he transferred from another Costco warehouse to assume that position. Three Assistant Managers reported to Resnikoff, including Glenn Johnson ("Johnson"), who came to the Holbrook Warehouse around the same time Resnikoff was assigned there. Department managers and supervisors "report up" to the Assistant Managers and Resnikoff. In turn, Resnikoff reports to a regional vice president, Richard Wilcox. Costco's Chief Executive Office is Craig Jelinek (hereafter, "CEO Jelinek").

## 2. Alleged Incidents While Fox Worked as a Greeter

In 2013, when Johnson became one of the Assistant Managers at the Holbrook Warehouse, Fox was working as a Greeter in Member Services. On two different instances, Johnson spoke to Fox regarding his job performance. Once, after he saw Fox leave the entrance area to move a large, flat cart outside, Johnson told Fox he was not to leave the entrance area to do so. When Fox responded that Greeters would commonly move carts to the outside, Johnson informed Fox, "There's a new boss in town, don't ever leave the door." (Fox Depo. 96:16-20.) Afterwards, Fox asked another Greeter – who is not disabled – whether she moved carts outside when she was working the entrance, to which she responded affirmatively.[4]

---

[4] Fox does not dispute that the other Greeter's response is hearsay evidence. (*See* Fox's LR 56.1 Statement at ¶33.)

Another time, Johnson came across an unattended front-end-cart on the Warehouse floor. He waited until the Member Services employee returned to the cart; it was Fox. Johnson questioned Fox about leaving the cart, asking, "Why did you leave the cart here?" Fox replied that none of the Member Services employees took the front-end-cart everywhere with them. With hands on hips, Johnson responded, "We're never going to have this conversation again." (Fox Depo. 96:3-15; Johnson Depo. 25:5-26:22.) Thereafter, Fox confirmed with a fellow, but non-disabled, Greeter that when she walked the floor, she would sometimes leave the front-end-cart unattended; she had not been told she should not do that.[5]

### 3. Complaints Against Fox While He Was a Greeter; Consequential Investigations; and Resulting Disciplinary Actions Taken

In late September 2013, Fox was working as a Greeter when he made a comment to a female member regarding her purse and her beauty, the exact verbiage of which Fox does not recall. Apparently, the member found Fox's comment troubling because she told her husband about it after she finished shopping, who then called Resnikoff to complain about it. (*See* Resnikoff Depo. 49:17-50:24.) Resnikoff spoke with both the husband and his member wife. (*Id.* at 47:4-9.) He then called Fox into his office to further investigate the incident. Fox did not dispute speaking to the member, but – in a written statement – stated he "would never say anything to offend anyone, [but] some people can take things the wrong way . . ." (Fox's LR 56.1 Statement at ¶39.) Thereafter, Resnikoff found the incident was a harassment of a member, constituting a major offense under the R&Rs, and issued Fox an Employee Corrective Consultation, which included a written warning that another offense of this nature would see him

---

[5] Fox does not dispute that this other Greeter's response is hearsay evidence. (*See* Fox's LR 56.1 Statement at ¶30.)

terminated, notwithstanding it was an outright dischargeable offense under the R&Rs.

Less than four months later, on or about January 15, 2014, another member asked to speak to Resnikoff about Fox since she found Fox's comment to her, *i.e.*, "You're the love of my life," to be inappropriate and which made her feel uncomfortable. Again, Resnikoff called Fox into his office to inquire about the exchange. As previously, Resnikoff had Fox write down his recollection of the incident, which Fox did not deny occurred. Resnikoff determined that Fox was in violation of Costco's R&Rs, repeating the major offense of harassing a member. Another Employee Corrective Consultation was issued to Fox; however, in lieu of being terminated, Fox was suspended for three days without pay. This decision was made with consultation of Wilcox, the regional vice president. When Fox returned, he was transferred to the Front End as an Assistant Cashier as a means "to help [him] not get into that problem again. . . . It [was] a team effort. So[,] if he started to go off course with his speech, there would be someone there to say, 'Hey.'" (Resnikoff Depo, 74:7-8, 16-18.) Resnikoff testified that, as part of "a team effort," any Costco employee is expected to try and stop a fellow employee from speaking inappropriately. (*Id.* at 74:19-75:2.)

Fox did not suffer any loss of pay or benefits by being transferred to the Assistant Cashier position. Moreover, Fox is not the only Holbrook Costco employee to be transferred from Member Services to the Front End; at least two other employees[6] were similarly reassigned after they were found engaging in defined offenses. (*See* Johnson Depo. 38:24-39:22, 42:4-43:13; Resnikoff Depo. 73:12-17.) Further, since Resnikoff became the Holbrook Warehouse's General

---

[6] There is nothing in the record indicating whether these other employees were disabled.

Manager, other Greeters[7] have been disciplined for various offenses such as poor performance and lateness.  (*See* Resnikoff Depo. 75:11-76:10.)

Fox alleges that during one of these two meetings with Resnikoff, Resnikoff made two disparaging comments directed at Fox's disability: "I cringe every time I walk by you," and "[Y]ou finally did it."  He cannot recall if anyone else was present in the office when Resnikoff made those statements.  Nor was Fox able to provide further context for the alleged comments. He did not complain to anyone in Costco's management about the comments.

### 4.  Fox's Reassignment to the Front End as an Assistant Cashier

Fox alleges he could have been assigned to another job, but does not recall if any jobs were posted or open when he returned from his suspension.  After his transfer to the Front End, on January 28, 2014, Fox asked for and was granted a month-long medical leave (from February 1 to March 1, 2014), while his medication was adjusted by his neurologist.  Sometime later in 2014, Resnikoff offered Fox a stocker position, which Fox declined.  He did not inform Resnikoff that the reason he turned down the offer was his (Fox's) belief that he would be working with others who allegedly mocked his tics.

While working as an Assistant Cashier, Fox alleges he was discriminated against because of his Tourettes and OCD.  For example, he alleged co-workers – whose names he could not

---

[7]  *See supra* note 6.

recall[8] – would make "hut-hut-hike" comments in response to Fox's verbal and physical tics,[9] which comments Fox further alleges his managers were "able to hear" at their podium station at the Front End.  (Fox's LR 56.1 Statement, Additional Facts, ¶103; *see also* Fox Affidavit at ¶8, attached as Exh. 1 to Tand. Declaration  ("[T]hese [hut-hut-hike] comments were audible to the managers of the Holbrook [W]arehouse from their position on the [W]arehouse's podium.").)  However, Fox did not recall complaining to management about those comments.[10]  Fox asserts these comments persisted for months, having begun when Resnikoff arrived at the Holbrook Warehouse.  (*See* Fox Affidavit at ¶7.)  However, he provided no evidence to support his claims regarding the "hut-hut-hike" comments (*e.g.*, times and dates when "hut-hut-hike" comments were made; some indication of the number of times per shift, week, or month that "hut-hut-hike" comments were made; and/or affidavits or testimony from co-workers or members attesting to having heard such comments being made, and/or the circumstances under which they heard "hut-

---

[8]  Fox does not dispute Costco's LR 56.1 Statement that "Fox does not recall which employees were saying "hut-hut'hike"," but asserts in his LR 56.1 Statement that he believes those comments were made by Glenn Rotondo, Ed Fabiano, and Steve Fabiano.  (*See* Fox's LR 56.1 Statement at ¶67.)

[9]  Fox testified that "instead of [saying the] F-word, I went like that (grunting), and they'd [(*i.e.*, co-workers)] say "hut-hut-hike . . . ."  (Fox Depo. 347:16-17.)  (*See also* Fox Aff. at ¶6 ("In order to suppress my saying an expletive, I occasionally would adjust verbal tics to a 'hut' sound as a substitute for saying something offensive.").)

[10]  The Court notes that, in an isolated exchange, Fox testified he told Resnikoff about the "hut-hut-hike" comments.  (*See* Fox Depo. 304:22-305:3 (during the meeting between Fox and Resnikoff when the two were reviewing Fox's March 2014 E-Mail Complaint)).  Significantly, however, Fox immediately thereafter vacillated, stating he was "pretty sure" he told Resnikoff about those comments, followed by subsequent testimony that he could not recall and did not remember whether he reported those comments to Resnikoff (*see id.* at 306:4-9, 307:4-7.)  In all other instances when asked whether he reported the "hut-hut-hike" comments to management, Fox testified that he did not recall or could not remember doing so.

hut-hike" comments).[11]

### 5. The March 2014 Break Incidents

On March 26, 2014, Fox was working as an Assistant Cashier when he asked the Front

End supervisor, Janine DiCandia ("DiCandia"), if he could go home to take his medication.  She

told Fox that she would have him replaced.  However, after at least 45 minutes, when that did not

happen, Fox again approached DiCandia and requested to go home; again, DiCandia responded

that she would have Fox replaced.  Sometime later,[12] when Fox was not replaced, he once more

went to DiCandia; this time, DiCandia told Fox to go on a break.  Fox responded that he was

asking to go home, at which point she directed him to speak with the Assistant Front End

Manager.  When Fox told the assistant manager he was not feeling well and asked to go home,

she granted his request.  Fox does not recall having any other incidents with DiCandia.

Fox was not scheduled to work the following day.  When he returned to work on March

28, 2014, with approximately an hour-and-one-half left on his shift, Fox asked the Front End

Manager, Colin Campbell, if he could take his last scheduled break.  Fox wanted to go to the

pharmacy department during this last break to have a prescription refilled.  Campbell stated he

---

[11]  In his deposition, assistant manager Glenn Johnson testified, *inter alia*, that he was not aware of anyone saying "hut-hut-hike".  (*See* Johnson Depo. Tr. 11:18-20; *see also id.* at 11:21-23, 11:8-17.)  (The Court notes that, while Johnson was asked whether he overheard anyone saying "hut-hut-hike" to Fox, the page which would contain Johnson's response has not been submitted for the Court's consideration.  (*See id.* at 11:24-25.))  There is nothing in the excerpted portion of Resnikoff's deposition, submitted in support of Costco's Summary Judgment Motion and relied upon by Fox in preparing his LR 56.1 Statement, addressing the "hut-hut-hike" comments.  (*See* Resnikoff Depo. Tr.)

[12]  While Fox does not dispute that it was approximately 45 minutes from his first request of DiCandia to his second request, he testified at his deposition that the span between the initial request to DiCandia and the time he was actually relieved to go home was several hours.  (*See* Fox Depo. 217:1-218:16.)

would give Fox his break, but when Fox approached Campbell towards the end of his shift, again requesting his break, Campbell told Fox he was marked down as having taken his last break. When Fox disputed the accuracy of the mark-down, Campbell responded that he would review the camera. Fox asserts he never received this last break, to which he was entitled.

### 6. Fox's March 29, 2014 E-Mail to CEO Jelinek[13]

Apparently frustrated by the two break incidents, on Saturday, March 29, 2014, at 7:18 p.m., Fox e-mailed Costco's CEO, Craig Jelinek, a three-paged, single-spaced letter to "let [him] know what is truly going on at one of your [Costco] locations." (Exh. J, attached to Galligan Decl. (ECF No. 25-2 at 137); hereafter, "E-Mail Complaint".) Initially, Fox provided some background information, *e.g.*, that he had worked for Costco for more than 18 years, during which time "[m]embers and employees have always been very supportive," and that he suffers from Tourettes and OCD, but that he was on medication which was controlling his symptoms. He continued that since January 2014, he had observed a change in the atmosphere at the Holbrook Warehouse, *i.e.*, increased tension, which he implied was attributable to new management. Fox informed CEO Jelinek of his belief that this new tension was causing him stress and exacerbating the symptoms of his disability. To deal with that, Fox informed CEO Jelinek that, on the advise of his doctor and for the first time, he (Fox) took a month's medical leave during which time his doctor altered his medications.

---

[13] It is undisputed that before sending his e-mail to CEO Jelinek, Fox contacted his Union, but was informed that the Union would be unable to help him; Fox does not recall the details associated with those Union contacts.

Fox then conveyed the two March 2014 break incidents. First, he described the March 26[14]th incident, asserting he was not feeling well and telling the supervisor[14] as much. He reported she said, "[L]et me know what you wanna do." He then conveyed to CEO Jelinek about asking multiple times for a break so he could take his medication, to which she replied she would see what she could do. Upon his final request for a break, the supervisor told Fox to speak to a manger. He asserted, "The Front [E]nd knew what I was saying and that I needed help and I needed my meds." He concluded with speculating about the possible bad publicity Costco would suffer if he had subsequently gotten into an accident because he was not allowed to leave early to take his medications.

Second, Fox described the March 28th incident when he asked to take his third break so he could "get a refill on [his] meds", but was denied that request on the mistaken belief that he already took that break. Fox asserted the manager's[15] comment regarding checking the camera (to determine whether Fox took the third break) was meant to threaten him. Fox attributed this alleged intimidation to causing him anxiety, which exacerbated his Tourettes symptoms.

Of significance, Fox never mentioned (1) the two occasions when he was a Greeter and was corrected by Johnson, (2) the two member complaints when he was a Greeter and which resulted in Resnikoff disciplining Fox, or (3) the "hut-hut-hike" comments allegedly directed at Fox due to his tics. Moreover, Fox never requested any accommodation or corrective action be taken in light of the March break incidents.

---

[14] Fox did not identify DiCandia as the supervisor he was discussing in the March 26th incident.

[15] Fox did not identify Campbell as the manager he was discussing in the March 28th incident.

### 7. Resnikoff's Investigation Regarding the E-Mail Complaint

Notwithstanding that Fox did not follow Costco's reporting protocols, three hours after receiving Fox's E-Mail Complaint, CEO Jelinek set into motion an investigation of the matter. To that end, Resnikoff met with Fox and all the other employees involved in the March break incidents. Resnikoff reviewed Fox's E-Mail Complaint with Fox, asking Fox to explain exactly what occurred during the two break incidents. It is undisputed that "Resnikoff asked Fox what he wanted to see happen and Fox indicated that it was up to Resnioff." (Fox's LR 56.1 Statement at ¶73.) Resnikoff transferred Campbell to a different position. There is no indication in the record whether any action was taken with respect to DiCandia. It is further undisputed that once Resnikoff concluded his investigation, it was reported to CEO Jelinek "that an investigation had taken place and that [Fox's] concerns were put at ease." (Costco's LR 56.1 Statement at ¶71; Fox's LR 56.1 Statement at ¶71.)

### 8. Alleged Events After the Conclusion of Resnikoff's Investigation

(a.) *The Time Sheet Incident* (Fox Depo. 321:14-322:10; 326:1-328:16): In October 2014, when stocking the Front End with necessary supplies, Fox noticed he did not have any time sheet, which employees use to track task completions. He made several requests to the Front End managers for such sheets, but to no avail. Fox avers that other, non-disabled employees were provided with requested time sheets. However, there are no allegations of disciplinary actions being taken against Fox for failing to turn in time sheets.

(b.) *The Jelly-Related Incidents* (Fox Depo. 322:11-325:23; 329:18-331:11; 331:24-334:12): On October 11, 2014, manager Jason ("Jelly") King snapped at Fox for leaving his register to get his Cashier water. Jelly told Fox he needed permission before leaving

his register. However, Fox does not recall whether he was disciplined for leaving the register.

Two days later and during a shift managed by Jelly, Fox observed another Assistant Cashier – who was not disabled – leaving his register without permission to get water for his Cashier.[16] That Assistant Cashier was not disciplined.

On October 13, 2014, Fox's Cashier asked him to retrieve a money tube so she could make "a drop" (*i.e.*, deposit money from her cash register). The money tubes were located away from the cash registers. Mindful of Jelly's directive, Fox told the Cashier he needed permission to leave the register to retrieve the tube. Fox alleges the Cashier "became infuriated with [him]" (Complaint at ¶56), and then called for manager Dave Johanson. When Johanson arrived, Fox explained what Jelly had instructed him. Fox asserts he "was reprimanded by Mr. Johanson," (*id.* at ¶56), but does not remember the context of the verbal reprimand. Fox does not remember any other incidents with Johanson.

(c.) *The Rodriguez-Related Incident* (Fox Depo. 336:14-338:10): On or about October 15, 2014, Fox was directed by Front End Manager Oscar Rodriguez not to wave members over to his Cashier's line, but to call them instead. In response, Fox told Rodriguez that he was previously instructed not to yell across the Front End. Though he does not recall Rodriguez's exact reply, it was something akin to: "That hasn't stopped you from yelling all day." (*Cf.*, Fox's LR 56.1 Statement at ¶¶91-92 (citing Complaint at ¶60), *with* Fox Depo. 201:18-20.) Fox did not complain about Rodriguez's reply, which Fox believed referred to his verbal tics. Other than Rodriguez's verbal instruction to Fox, no corrective action was taken by Rodriguez. Fox has had no other incidents with Rodriguez.

---

[16] No further facts are provided for context.

(d.) *The Froll-Related Incident*s (Fox Depo. 343:5-23; 343:5-347:10):  At an unidentified time, Fox was acting as Cashier Katie Froll's Assistant Cashier.  Froll was distracted when a member came through the line with a coat[17] sold by Costco.  The member was saying she had bought the coat at another Costco warehouse, but – apparently because she was distracted – Froll began ringing up the item.  The woman repeated herself, to which Froll responded, "Oh, at least one of us is doing our job."  Fox believed that comment was directed towards him.  There is no indication that Fox reported this incident to anyone at the Warehouse.

On another occasion, Froll told Fox, "You're annoying me; get out of my face."  It is unclear the context in which this comment was made.  However, a manager heard Froll's comment to Fox and had Fox fill out a report.  In his complaint, Fox also mentioned the first (coat) incident.  Thereafter, Fox was told not to work with Froll.  The one time he was assigned to Froll, Fox informed the manager that he was not to assist her.  He was immediately re-assigned to another Cashier; Fox did not work with Froll again.

(e.) *The Smeja-Related Incident* (Fox Depo. 341:13-343:4):  In another incident (without any time reference), Fox was assisting a Cashier when that Cashier was replaced by another one, Mike Smeja.  When Smeja came to the register, he looked at Fox and commented "Oh, my ring times are going down."  Fox reported this comment to the supervisor at the time, a woman named Simone.  The next day, Simone informed Fox she had spoken with Smeja, who said he would apologize to Fox.  Smeja never did.  Fox did not further pursue reporting of the incident.

---

[17]  The Court notes that Fox testified the item was either a coat or a purse and that he could not remember precisely the item in question.

### 9. November 1, 2104 and Thereafter

On November 1, 2014, Fox suffered an anxiety attack and began acting incoherently at work. A Costco employee called an ambulance for Fox. Thereafter, he was walked out of the building with EMT personnel and driven to a hospital via ambulance. Fox was released later the same day. Since then, Fox has been on indefinite medical leave, where he currently remains.

### B. Procedural Background

On August 14, 2014, Fox filed a *pro se* complaint with the New York State Division of Human Rights asserting disability discrimination and retaliation. On October 3, 2014, the New York State case was administratively closed because Fox "wishe[d] to pursue the matter in Federal District Court." (*See* EEOC Dismissal and Notice of Rights, Charge No. 16G-2014-04243, attached as Exh. A to Complaint.) On January 29, 2015, Fox filed his Verified Complaint (*See* ECF No. 1.) Costco filed its Answer on March 30, 2015. (*See* ECF No. 5.) After discovery was conducted, Costco filed a fully briefed motion for summary judgment (*see* ECF No. 25), including Fox's opposition thereto (*see* ECF No. 25-5).

### III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). In each case, the relevant governing law determines which facts

are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the nonmovant, that no rational jury could find in the nonmovant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion which is properly supported by affidavits, depositions, or other documentation, the nonmovant must offer similar materials setting forth specific facts showing there is a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). More than a "scintilla of evidence", *see Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *see Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), is required of the nonmovant. Nor can the nonmovant rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

Further, when considering a summary judgment motion, a district court must be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the

respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. In such an instance, the burden shifts to the nonmovant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587). Moreover, "[t]he evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor.'" *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)(quoting *Anderson*, 477 U.S. at 255)).

### B. Plaintiff's Disability Discrimination Claims

Fox brings his disability discrimination claims pursuant to the Americans with Disabilities Act ("ADA") (42 U.S.C. §§ 12111 *et. seq.*) and New York State Human Rights Law ("NYSHRL") (N.Y. Exec. Law §§ 290 *et. seq.*). (*See* Complaint at ¶67.) Claims brought pursuant to the ADA

> are analyzed under the three-step burden-shifting framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792411 U.S. 792, 93 S. Ct. 1817,36 L. Ed.2d 668 (1973). *See, e.g., McBride v. BIC Consumer Products Mfg. Co.,* 583 F.3d 92, 96 (2d Cir.2009) (ADA); *see also Regional Economic Community Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48-49 (2d Cir.2002) (applying *McDonnell Douglas* framework to claims of intentional discrimination under the ADA . . .). Accordingly, a plaintiff alleging discrimination under [the ADA] must establish a prima facie case; if he does so, then ''the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of

> persuasion that the proffered reason is a pretext.'' *Sista v. CDC*
> *Ixis North America, Inc.,* 445 F.3d 161, 169 (2d Cir.2006). ''[T]he
> ultimate burden rests with the plaintiff to offer evidence sufficient
> to support a reasonable inference that prohibited [disability]
> discrimination occurred.'' *Woodman v. WWOR–TV, Inc.,* 411 F.3d
> 69, 76 (2d Cir.2005) (quotation marks and citation omitted).

*Castro c. City of N.Y.*, 24 F. Supp.3d 250, 260 (E.D.N.Y. 2014); *see also Graves v. Finch Pruyn*

*& Co., Inc.*, 353 Fed. App'x 558, 560 (2d Cir. 2009). Fox's disability discrimination claims are

brought under three different theories: (1) hostile work environment, (2) disparate treatment due

to disability, and (3) failure to accommodate. The Court will address each claim in turn and

pursuant to the ADA. Those claims pursuant to NYSHRL will be addressed together in Part D,

below.

### 1. Hostile Work Environment

To prevail on a claim of hostile work environment,[18] Fox "must demonstrate (1) that [his]

workplace was permeated with discriminatory intimidation that was sufficiently severe or

pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for

imputing the conduct that created the hostile environment" to Costco. *Schwapp v. Town of Avon*,

118 F.3d 106, 110 (2d Cir. 1997)(brackets in *Schwapp*); *see also Alfano v. Costello*, 294 F.3d

365, 373 (2d Cir. 2002) (same). This standard is a "demanding one," *Scott v. Mem'l Sloan-*

*Kettering Cancer Ctr.*, 190 F. Supp.2d 590, 599 (S.D.N.Y. 2002), requiring a plaintiff establish

---

[18] "Courts have held that hostile work environment claims under [the] ADA . . . are
evaluated under the same standards as Title VII claims." *Scott v. Mem'l Sloan-Kettering Cancer
Ctr.*, 190 F. Supp.2d 590, 599 (S.D.N.Y. 2002)(citing *Disanto v. McGraw-Hill, Inc./Platt's Div.*,
No. 97-cv-1090, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998)(regarding ADA; further
citation omitted); *see also Castro*, 24 F. Supp.3d at 261 n.23 (citing *Brady v. Wal-Mart Stores,
Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)); *Monterroso v. Sullivan & Cromwll, LLP*, 591 F. Supp.2d
567, 584 (S.D.N.Y. 2008).

both objective and subjective components, *to wit*, "not only that [the plaintiff] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010).

In analyzing hostile work environment claims, "[c]ourts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y.City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). "Among the factors to be considered in determining whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *Scott*, 190 F. Supp.2d at 599 (citing *Harris*, 510 U.S. at 23). "[T]he Second Circuit has made it clear that insensitive comments are not per se unlawful." *Id.* (citing *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999)).

At the outset, the Court will assume that Fox subjectively perceived the environment at the Holbrook Warehouse to be abusive. Indeed, the record amply supports that assumption. The Court will, therefore, turn its focus to whether the environment at the Holbrook Warehouse was objectively hostile and abusive. It will do so in two steps: (1) when Fox was a Greeter, and (2) when Fox was an Assistant Cashier.

(a.) *Fox as a Greeter*

As to the two incidents Fox had with Glenn Johnson: While Fox alleges Johnson reprimanded him, when viewed objectively, those two encounters, as a matter of law, cannot be characterized as hostile or abusive. Undoubtedly, when one is corrected by a supervisor regarding one's job performance, it can be uncomfortable at best, if not embarrassing or even

unnerving.  Yet, it is not uncommon for new management to have a different, heightened expectation for its employees' job performances.  Johnson's conveying that expectation to Fox on two different occasions was neither severe nor pervasive.  *See, e.g., LaBella v. N.Y. City Admin. for Children's Servs.*, No. 02-cv-2355, 2005 WL 2077192, *20 (E.D.N.Y. Mar. 28, 2005)("[A]n employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult.").  Objectively reviewing the record, even if Johnson had his hands on his hips when speaking to Fox, there is no basis to conclude that, as a matter of law, Johnson was physically threatening or humiliating Fox.  Nor does the record support a finding that Johnson's "reprimands" – as Fox characterizes them – unreasonably interfered with Fox performing his Greeter job.  Indeed, there is a dearth of evidence that Fox's Tourettes or OCD had any relevance to Johnson's verbal corrections of Fox.  *See, e.g., Murphy v. BeavEx, Inc.*, 544 F. Supp.2d 139, 151 (D. Conn. 2008)(finding comments directed at plaintiff-employee's job performance did not display "discriminatory animus" and did not support an ADA hostile work environment claim)(citing *LaBella*, 2005 WL 2077192, at *20).  Further, Fox's conversations with other Greeters regarding how they performed their job tasks is of little help to his claims of disability discrimination principally because those conversations were, indisputably, hearsay.  In sum, when viewed objectively, the two corrective encounters with Johnson where isolated, sporatic incidents.  As such, a rational fact-finder would be unable to find those encounters to have caused the terms and conditions of Fox's employment to have been altered.

The investigations by Resnikoff of two different members' complaints about Fox also fails to establish a hostile work environment claim.  As an initial observation, both instances were initiated by members, over whom Costco has no control.  Nonetheless, objectively

reviewing the record of Costco's investigation of those complaints in the light most favorable to Fox, a rational fact-finder would not be able to find hostility or abusiveness supporting a hostile work environment claim.

Moreover, the record shows that in each instance, Resnikoff identified the involved employee by gender, not disability, as the complaining members indicated the employee was a male greeter, not a greeter with a disability. There is no evidence before the Court suggesting that Fox's disability had any bearing on the investigations.[19] Even if, *arguendo*, such was not the case, on the current record no rational fact-finder could find that the investigations were so severe or pervasive as to altered the terms and conditions of Fox's employment.

Likewise, the two comments Resnikoff made to Fox during the investigations of members' complaints do not establish a hostile work environment claim. *See, e.g., Hong Yin v. North Shore LIJ Health System*, 20 F. Supp.3d 359, 370-71 (E.D.N.Y. 2014) (finding three incidents of arguably negative comments to be to be too isolated and minor to warrant relief under a hostile work environment theory); *see also Forgione v. City of N.Y.*, No. 11-cv-5248, 2012 WL 4049832, at *7 (E.D.N.Y. Sept. 13, 2012)(dismissing hostile work environment claim where defendant "made several offensive quips to [plaintiff] about his perceived disability and told [plaintiff] he needed to see a psychiatrist"). As a preliminary matter, it is difficult for the Court to assess Resnikoff's comments because Fox could not provide context for them. However, drawing all inferences and resolving all ambiguities in Fox's favor, and examining all the circumstances, to the extent presented and objectively viewed, a rational fact-finder could not

---

[19] Resnikoff testified that any employee could justifiably have been terminated based on the incidents involving Fox since they were major violations, which are cause for termination. (*See* Resnikoff Depo. at 76:8-24.) There is no evidence in the record to the contrary.

find in Fox's favor since, as a matter of law, the comments were isolated and sporadic in nature, and did not alter the terms and conditions of Fox's employment at the Holbrook Warehouse.

(b.) *Fox as an Assistant Cashier*

While Fox complains of "hut-hut-hike" comments made by co-workers, which he asserts persisted for months (discussed further, below), the record shows Fox does not recall, other than one possible time,[20] bringing those comments to the attention of his managers or to CEO Jelinek. Moreover, despite alleging that management was able to hear the "hut-hut-hike" comments from their podium station at the Front End of the Warehouse, Fox does not offer evidence to support that allegation or from which it could be inferred, given attendant circumstances, that a reasonable person would have heard the comments (*e.g.*, evidence of the proximity from the managers' podium to the cash registers, evidence regarding the auditory conditions at the Front End, and/or affidavits of Front End co-workers or Costco members who heard the comments). It is not enough for Fox to rely, post-discovery, on his conclusory statement that the "hut-hut-hike" comments "were audible to the managers of the Holbrook [W]arehouse from their position on the [W]arehouse's podium" (Fox Affidavit at ¶8, attached as Ex. 1 to Tand Decl.), or his belief that if he heard the comments, so too did his managers (*see*, *e.g.*, Fox Depo. 347:25-348:4), absent any information as to their respective locations when the utterances were made. Rather, to withstand Costco's Summary Judgment Motion, Fox must do more than present conclusory statements; he must present "concrete evidence from which a reasonable [fact-finder] could return a verdict in his favor." *Liberty Lobby, Inc.*, 477 U.S. at 256; *see also Western World Inc. Co. v. Stack Oil , Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). Here, there simply is no such evidence.

---

[20] *See supra* note 10.

Similarly, other than his bald allegation that the "hut-hut-hike" comments "persisted for months," from Resnikoff's June 2013 arrival at the Holbrook Warehouse until Fox's November 2014 medical leave (Fox Affidavit at ¶7), Fox does not submit any evidence which would quantify his claim of persistence[21] (*e.g.*, evidence regarding the number of times the comments were made per shift, week and/or month). Given that void, a rational fact-finder would be foreclosed, as a matter of law, from finding that the "hut-hut-hike" comments were "sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)(internal citations and quotation marks omitted); *see also Balanze v. Town Fair Tire Centers, Inc.*, No. 3:02-cv-2247, 2005 WL 752198, at *8 (D. Conn. Mar. 31, 2005) (citing *Perry*). The lack of probative evidence regarding the alleged persistence of the "hut-hut-hike" comments also means a rational fact-finder would be unable to determine whether they "amount to discriminatory changes in the terms and conditions of employment sufficient to meet the threshold of severity or pervasiveness" *Crawford v. N.Y. Life Ins. Co.*, No. 04-cv-1853, 2006 WL 2792779, at *8 n.4 (E.D.N.Y. Sept. 27, 2006). Hence, based on the "hut-hut-hike" comments, no rational fact-finder could find that Fox has established a claim of a work environment that was objectively hostile and abusive.

Likewise, the incidents which occurred after Fox's E-Mail Complaint (*see supra* pp. 12-14), when viewed objectively, collectively, and in the light most favorable to Fox, do not, as a matter of law, rise to the level of severe pervasiveness permitting a finding a hostile work environment. Fox's vague and conclusory allegations that these incidents were related to his

---

[21] "Persistent" is defined as, *inter alia*, "existing for a long or longer than usual time or continuously." *See* definition, available at https://wwwmerriam-webster.com/dictionary/persistent.

Tourettes and OCD, without more, fail to support his ADA-based hostile work environment claim. *See Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003)("Purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient." (Internal quotations omitted; further citation omitted)). Rather, when the record is objectively examined as a whole, no rational fact-finder could find those incidents to be "sufficiently continuous and concerted [as] to have altered the conditions of [Fox's] working environment."[22] *Alfano*, 294 F.3d at 373 (internal quotations omitted; further citations omitted). Even giving Fox the benefit of finding the incidents to be "unpleasant, harsh, combative or difficult," *LaBella*, 2005 WL 2077192 at *20, that assumption in Fox's favor, without more, does not morph the incidents into evidence of discriminatory animus, let alone a workplace so severely "permeated with discriminatory intimidation, ridicule, and insult," *LaBella*, 2005 WL 2077192 at *19, that the terms and conditions of his employment were thereby altered. *See Alfano*, 294 F.3d at 373; *LaBella*, 2005 WL 2077192 at *20. Accordingly, based on the totality of the alleged incidents, no rational fact-finder could find in Fox's favor on his hostile work environment claim.

### 2. Disparate Treatment

In order to make out a prima facie claim of disparate treatment based on disability under the ADA, a plaintiff must show that his employer is subject to the ADA, that he is disabled within

---

[22] The Court recognizes that a single incident which is extraordinarily severe may, by itself, be enough to establish a work environment which is pervasively abusive. *See Alfano*, 294 F.3d at 373 ("[I]t is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace.")(*citing Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)). However, on the record presented, no rational fact-finder could find that any of the post-E-Mail Complaint incidents were such an incident.

the meaning of the statue, that he was "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation," and that "he suffered an adverse employment action because of his disability."

*Castro*, 24 F. Supp.3d at 260 (citing *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)). The *Castro* court continued:

> An adverse employment action is defined "as a materially adverse change in the terms and conditions of employment." *Sanders v. New York City Human Resources Administration*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). A "materially adverse" change must be something "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may include, for example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," among others. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)(internal quotation marks and citations omitted).[]

*Id.* at 261 (omitting footnote after citation to *Terry* case, which notes *Terry* is a Title VII case, but considers the same factors with respect to claims brought pursuant to the ADA).

Here, there is no dispute that Costco, Fox's employer, is subject to the ADA. Nor has Costco argued or otherwise disputed that Fox is disabled within the meaning of the statute.[23] Likewise, whether Fox was "otherwise qualified, either with or without reasonable accommodation" is not up for debate, as it appears Costco concedes that point.[24] The crux of Fox's disparate treatment claim is whether he suffered an adverse employment action because of

---

[23] The Court notes that Costco's implicit concession that Fox is disabled within the meaning of the ADA does not make him so. *See generally Cameron*, 335 F.3d at 63; *Balonze*, 2005 WL 752198, at *5-8. However, since the Court finds Fox cannot maintain his disparate treatment discrimination claim on other grounds, it declines to further discuss the first and second prongs of a disparate treatment prima facie claim.

[24] *See supra* note 23.

his disability.  Thus, the Court focuses its analysis on that component of the claim.

(a.) *Fox as a Greeter*

As discussed, *supra*, when working as a Greeter, Fox complains of two instances when Glenn Johnson reprimanded him for leaving the Warehouse's entrance area and leaving a front-end-cart unattended.  However, being spoken to – even if it was in a harsh manner – does not demonstrate an adverse employment action.  Fox was not written up or issued a corrective action statement.  In fact, other than speaking to Fox, the record shows Johnson took no further actions as to these incidents.  Moreover, Johnson's corrective directions did not create any materially adverse change in the terms and conditions of Fox's employment.  To the extent Fox attempts to establish a discriminatory disparate treatment claim based on his conversations with non-disabled greeters regarding how they performed greeter job functions and whether they were subjected to correction, that attempt fails as Fox's evidence of those conversation is inadmissible hearsay.  Therefore, based on Johnson's corrective directive, a rational fact-finder could not find in favor of Fox's disparate treatment claim.

Fox also had two member-initiated complaints logged against him when he was working as a Greeter.  For the first complaint, after an investigation by Resnikoff, which included Resnikoff questioning Fox about the incident and asking for his (Fox's) version of the encounter, Resnikoff issued an Employee Corrective Consultation, which advised Fox that the incident was considered a major offense and warned him that another, similar incident would subject him to termination.  It is undisputed that the major offense was, in and of itself, grounds for termination.  (*See supra* Part II(A)(3), and note 19.)  However, other than the written warning, no other action was taken, let alone a materially adverse change in Fox's employment.

After the second complaint and another investigation by Resnikoff, in which Fox was found to have committed a major offense, Fox was suspended without pay for three days; upon his return, Fox was transferred to the Front End. Despite the warning of termination for a repeat offense, that did not occur. The transfer was not a demotion; Fox was not paid less and did not lose any benefits; his responsibilities were not significantly diminished. Even assuming the transfer to the Front End to work as an Assistant Cashier was inconvenient or an alteration of Fox's job responsibilities, that is not enough, as a matter of law, to establish a "materially adverse" change in his employment. *See Castro*, 24 F. Supp.3d at 261 (citing *Terry*, 336 F.3d at 138). Thus, the record does not support a claim of adverse employment action related to the second member's complaint. On this basis, therefore, a rational fact-finder could not find in Fox's favor on his disparate treatment claim.

### (b.) *Fox as an Assistant Cashier*

The Court focuses on two categories of situations which occurred while Fox was an Assistant Cashier: the March break incidents – prompting Fox's E-Mail Complaint – and the post-E-Mail Complaint incidents.

As to the March break incidents, there is no genuine dispute that Fox was entitled to breaks. Rather, the issue is whether (1) the delay in granting Fox's requested relief from work (*i.e.*, the first March break incident) and (2) the denial of Fox's last break (*i.e.*, the second March break incident) constitute a material loss of benefits as to warrant a materially adverse change in the terms and conditions of his employment. The Court will assume the March break incidents were related to Fox's disability, even though Fox's allegations that his supervisors knew he needed to take his medications are unsubstantiated. Notwithstanding their temporal proximity,

the March break incidents appear to be isolated occurrences. There is no other evidence of delayed or denied breaks. Nor is there anything in the record demonstrating that as a result of complaining about the March break incidents, Fox was demoted, given a lesser title, lost any benefits (material or otherwise), or had material responsibilities significantly diminished – all indicia of a "material adverse" change in terms and conditions of employment. *See Castro*, 24 F. Supp.3d at 261. Hence, objectively viewed, a rational fact-finder could not find that the delay and denial constituted a material loss of benefits. Stated differently, the March break incidents are not enough to establish, as a matter of law, a materially adverse change in the terms and conditions of Fox's employment.

Similarly, the Court has considered all the post-E-Mail Complaint incidents of which Fox complains. Viewed objectively, both individually and collectively, those incidents did not lead to any materially adverse change in the terms and conditions of Fox's employment. Neither the incidents themselves, nor Fox's selected complaints about them, cause him to be demoted, to lose a material benefit, to suffer a decrease in wage or salary, to be reclassified with a less distinguished title, to suffer significantly diminished material responsibilities or to be terminated. *See id.*. Hence, even assuming these complained-of incidents where related to Fox's disability, given the absence of evidence of a materially adverse change in the terms and conditions of Fox's employment, he cannot make out a prima facie claim of disparate treatment.

### 3. Failure to Accommodate

> To establish a prima facie case for failure to accommodate, a plaintiff must demonstrate that he is disabled within the meaning of the ADA, that his employer is a covered entity, that he could perform the essential functions of his job with an accommodation, and that the defendant[] refused to provide such an

accommodation.

*Castro*, 24 F. Supp.3d at 267 (citing *McBride v. BIC Consumer Prod. Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009)). "There must be a causal connection between the disability and the requested accommodation." *Id.* (citing *Rogers v. Roosevelt Union Free Sch. Dist.*, No. 09-cv-3862, 2012 WL 6163130, at *6 (E.D.N.Y. Dec. 7, 2012)), *aff'd* 553 Fed. App'x 88 (2d Cir. 2014)).

> Although it is generally the responsibility of the individual with a disability to inform the employer that an accommodation is needed, under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation. Nevertheless, an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal.

*McElwee v. County of Orange*, 700 F.3d 635, 641-42 (2d Cir. 2012)(internal quotation marks and citations omitted).

As a Greeter, Fox did not ask for any accommodations. Rather, it was after the second member complaint about Fox, when he was a Greeter, that Costco transferred Fox. As Resnikoff testified, the transfer was a way to help Fox avoid another member complaint; it was part of Costco's "team effort" to keep its employees – regardless of disability status – from getting into situations where they might say something they should not.

While Fox does not dispute that both his Greeter job and Assistant Cashier job involved counting (*see* Fox's LR 56.1 Statement at ¶52), Fox further asserts "the Assistant Cashier position entailed a much faster pace than Plaintiff's disability allows". (*Id.*) Yet there is nothing in the record demonstrating that Fox ever informed anyone at the Holbrook Warehouse of this.

Rather, the record before the Court establishes that Fox never requested another position in lieu of Assistant Cashier. It also demonstrates that Resnikoff subsequently offered Fox a position as a stocker, which Fox refused. That refusal was based on Fox's fear of being harassed by co-workers, but about whom Fox does not recall complaining.

When Fox requested accommodations, they were provided to him. For example: A short time after his transfer to the Front End, Fox requested a one-month medical leave while his medication was adjusted by his neurologist, which leave was given to him. Similarly, after his panic attack in November 2014, when he left work in an ambulance to go to the hospital, Fox went out on indefinite medical leave. He presently remains on indefinite medical leave. Thus, Costco is continuing to accommodate Fox.

As to the other incidents of which Fox complains:

(i) The March break incidents cannot be construed as requests for accommodations. The breaks Fox sought where benefits to which he was entitled. They were not "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." *Castro*, 24 F. Supp.3d at 267 (defining "reasonable accommodation" under the ADA; quoting 29 C.F.R. § 1630.2(*o*)(1)(ii)). Even if that were not so, after his E-Mail Complaint to CEO Jelinek, Fox did not suffer any further occasions where his breaks were delayed or denied. Furthermore, Costco took corrective action when it transferred one of the supervisors involved in the March break incidents to another position. There is nothing in the record showing Fox had any further interactions with the involved supervisors.

(ii)  Similarly, the Time Sheet Incident, the Jelly-Related Incidents, and the Rodriguez-Related Incident cannot be construed as requests for accommodations since, as a result of each, Fox did not seek modifications or adjustments to enable him to perform the essential functions of the Assistant Cashier position.  *See id.*  As to the Froll Incidents, Fox did not request any accommodation.  Instead, when a supervisor heard Froll's comment, he proactively accommodated Fox by ensuring Fox no longer be assigned to Froll as her Assistant Cashier.  As to the Smeja-Related Incident: while Fox complained about Smeja's comments, he did not request any accommodation from Costco.  Rather, Costco again acted proactively, securing a promise from Smeja to apologize to Fox.  When Smeja did not deliver the promised apology, Fox did not further pursue his complaint with Costco management.

In sum, to the extent Fox requested accommodations of Costco, they were granted.  To the extent Fox did not want to work as an Assistant Cashier, there is no evidence in the record to support that allegation.  Further absent from the record is evidence that Fox asked to be assigned to another position or that another position, which Fox could perform, was available.  *See McBride*, 583 F.3d at 97 ("The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment, including the existence of a vacant position for which [he] is qualified.").  Finally, Fox's failure to accommodate claim is compromised by the evidence that Resnikoffs offered Fox a stocker position.  *See Waltzer v. Triumph Apparel Corp.*, No. 09-cv-288, 2010 WL 565428, at *6 (S.D.N.Y. Feb. 18, 2010)("[W]hen any reasonable accommodation is provided, the statutory inquiry ends.").  On the record presented, a rational fact-finder would be unable to find that Fox has established a prima facie case for failure to accommodate.

*C. Plaintiff's Retaliation Claim*[25]

To present a prima facie case of retaliation, a plaintiff-employee:

> must establish that (1) the employee was engaged in an activity
> protected by the ADA, (2) the employer was aware of that activity,
> (3) an employment action adverse to the plaintiff occurred, and (4)
> there existed a causal connection between the protected activity
> and the adverse employment action.

*Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2002); *see also Castro*, 24 F.

Supp.3d at 268 (quoting *Weissman*). As to the first element of a retaliation prima facie case, a

protected activity under Title V of the ADA includes making a charge, testifying, assisting or

participating in any manner in an investigation, proceeding, or hearing under the Act. *See* 42

U.S.C. § 12203(a); *see also Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir.

2002); *Castro*, 24 F. Supp.3d at 268.

The parties agree that Fox engaged in protected activities on two occasions: when he sent

his E-Mail Complaint to CEO Jelinek on March 29, 2014, and when he filed a complaint with

the New York State Division of Human Rights on August 14, 2014. At issue is whether there is

evidence that Fox suffered employment action adverse to him and, if so, whether there is a causal

connection between the two occurrences and adverse employment action.

Fox advances two arguments in support of his retaliation claim: (1) Resnikoff laughed at

Fox and brushed off Fox's concerns during the E-Mail Complaint investigation, and (2) the

hostile work environment to which Fox was exposed was retaliatory. (*See* Fox's Opp'n at 15-

16). Those arguments are unavailing.

---

[25] Similar to Fox's disability discrimination claims, this retaliation claim is also analyzed
under the *McDonnell Douglas* framework. *See Castro*, 24 F. Supp.3d at 268 (citing *Treglia v.
Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)). *See also supra* Part III(B).

As to Resnikoff, it is undisputed that he: reviewed Fox's E-Mail Complaint with him; asked Fox what result he would like to have happen, which Fox left in Resnikoff's hands; and, thereafter transferred one of the supervisors involved in the March break incidents to another position. Further, Fox does not dispute that at the conclusion of the investigation, his "concerns were put at ease." (Fox's LR 56.1 Statement at ¶71.) Notwithstanding Fox's conclusory allegations to the contrary, the record does not evince that Resnikoff engaged in adverse employment action directed at Fox. As such, a reasonable fact-finder could not find in Fox's favor on his retaliation claim on that basis. Relatedly, because the Court finds a reasonable fact-finder could not find in Fox's favor on his hostile work environment claim (having been unable to make out a prima facie case), his argument of retaliation based on hostile work environment - as an adverse employment action – also cannot stand as a matter of law.

To the extent Fox argues he has been constructively discharged in retaliation for his protected activities under the ADA, that argument is unavailing.

> "An adverse employment action may also take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that *the employee is forced into an involuntary resignation*." *Caskey v. County of Ontario*, 560 Fed. Appx. 57, 59, 2014 WL 1099232, at *2 (2d Cir. March 21, 2014)(quoting *Morris v. Schroder Capital Management International*, 481 F.3d 86, 88 (2d Cir. 2007)).

*Castro*, 24 F. Supp.3d at 266 (emphasis added). The *Castro* court instructs that a plaintiff-employee must show both that an employer acted deliberately in bringing about intolerable work conditions and "when assessed objectively, [that] a reasonable person in the employee's position would have felt *compelled to resign*." *Id.* (citing *Petrosino v. Bell Atlantic*, 385 F.3d 210, 299-30

(2d Cir. 2004).

In this instance, Fox has not resigned; rather, it is undisputed that he remains on medical leave from Costco. (*See* Fox's LR 56.1 Statement at ¶99 (not disputing Costco's statement that "[i]n November 2014, Fox went out on medical leave, where he had remained until the present day"); *see also id.* at ¶4 (not disputing that Fox worked at Costco "from March 1996 through the present").) That fact coupled with Fox's inability to make out a prima facie case of hostile work environment, as well as the absence of objective evidence that Costco acted deliberately to do so, supports the conclusion that no reasonable fact-finder could find in Fox's favor on his adverse employment action claim under the theory of constructive discharge.

### D. Plaintiff's Claims Pursuant to N.Y.S. Human Rights Law (N.Y. Exec. Law §§ 290 et. seq.)

The Second Circuit instructs that "We consider [a plaintiff's] state law claims in tandem with . . . Title VII claims because New York courts rely on federal law when determining claims under the New York [State] Human Rights Law." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996)). Since courts presented with ADA claims employ the same analytical framework as used for Title VII claims, *see supra* Part III(B), where those claims cannot be maintained under the ADA, they likewise cannot be maintained under NYSHRL. Thus, for the same reasons discussed, *supra*, Fox's disability discrimination and retaliation claims under NYSHRL cannot survive Costco's Summary Judgment Motion. *See, e.g.*, *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 12-cv-1484, 2015 WL 1223797, *14 (E.D.N.Y. Mar. 17, 2015). Even if that were not so, the Court would decline to exercise supplemental jurisdiction over Fox's remaining state law claims pursuant to

New York Executive Law §§ 290 *et. seq.* having determined that Costco is entitled to summary

judgment on all of Fox's federal claims. *Cf. Castro*, 24 F. Supp.3d at 272-73.


IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Costco's Summary Judgment Motion is

GRANTED. The Clerk of Court is directed to enter judgment in favor of the Defendant.


Dated this 6th day of March 2017 at Central Islip, New York.

_____/s/_____
Denis R. Hurley
Senior District Court Judge, E.D.N.Y.